**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE-OPELOUSAS DIVISION**

| | | |
|---|---|---|
| **ASHLEY GARDNER** | * | **CIVIL ACTION NO. 07-2215** |
| **VERSUS** | * | **JUDGE HAIK** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

**REPORT AND RECOMMENDATION**

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Ashley Gardner, born May 17, 1987, filed an application for supplemental security income through her mother on July 10, 1987, alleging disability as of March 1, 1989, due to spina bifida with bowel and bladder involvement and borderline intellectual functioning. The application was originally denied, then reversed on reconsideration in light of the *Sullivan v. Zebley* decision.[1]  (Tr. 90-95).

On June 8, 2005, the Social Security Administration ("SSA") notified claimant that her disability would be reviewed based on her reaching the age of majority. (Tr. 254-55). On November 2, 2005, SSA determined that her disability had ceased as of

---

[1] 493 U.S. 521, 110 S.Ct. 995, 107 L.Ed.2d 967 (1990).

November 1, 2005. (Tr. 256-288). Following exhaustion of administrative remedies, claimant appealed the decision to this Court.

FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:[2]

**(1) Report from Dr. Walter J. Scott, III dated July 10, 1988**. Dr. Scott wrote that claimant, who was one year old, had incontinence of urine and feces in conjunction with meningomyelocele.[3] (Tr. 41). He stated that she had a patuluos rectum and never completely emptied her bladder. She had signs of no motor control over those sphincters and showed permanent loss of control.

---

[2] Although all of the medical records were reviewed by the undersigned, only those relating to the latest decision are summarized herein.

[3] Protrusion of the spinal cord and its membranes through a defect in the vertebral column. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2008).

**(2) Records from Lafayette Children Special Health Services dated March 18, 1999 to November 17, 1999.** On March 18, 1999, claimant was 11 years old and doing well on catheterization. (Tr. 220). She catheterized only twice a day, voided in between times, and was totally dry. An ultrasound showed normal kidneys. She had not had any problems.

On September 16, 1999, Dr. Edwin Harmon reported that claimant was doing catheterization herself, starting on four times a day. (Tr. 218). Her urine was clear.

**(3) Records from Tulane University Hospital and Clinic dated November 17, 1999 to May 20, 2004.** On November 17, 1999, Dr. James T. Bennett reported that claimant was being followed up for spina bifida and myelodysplasia. (Tr. 217). UCBLs were perfectly casted, with just a slight amount of varus.

On May 20, 2004, claimant had decreased sensation in her feet and a little bit of soreness on the bottom of her left foot. (Tr. 339). She did not participate in PE, but walked for exercise as recommended by her doctor. Dr. Bennett put a metatarsal pad under the second metatarsal to try to lift it.

On December 15, 2004, claimant reported that she had been using an exercise bicycle. (Tr. 338). Dr. Bennett stated that biking was the best exercise

for her.  He modified her brace.

`        **(4) Consultative Psychological Evaluation by Henry J. Lagarde, Ph.D., dated March 31, 2005**.  Administration of the Wechsler Adult Intelligence Scale – Third Edition revealed a verbal IQ score of 77, performance score of 79, and full-scale score of 76.  (Tr. 340).  Claimant was able to perform all dressing and grooming activities on her own.  (Tr. 341).

Claimant knew how to cook simple items on the stove.  When not in school, she watched television, shopped, helped with chores, and spent time with friends.  She could manage money effectively for her age.  She performed clerical work through the JTPA program from October to December, 2004.

Claimant thought logically and coherently.  Her speech was spontaneous and relevant.  She maintained adequate attention and concentration.

Claimant's memory was adequate.  She was oriented in all spheres with a fairly good knowledge of current events.  Affect was appropriate to issues and well-modulated.

Capacity for judgment was a relative weakness; however, that difficulty was not reflected in social relationships or authority relationship difficulties.  Insight was intact.

Intellectually, claimant was functioning in a borderline range. Her persistence and concentration were good. Academically, she was functioning in a borderline to low average range.

The MMPI-A Profile was consistent with a teenager who was struggling with maintenance of satisfactory, pleasurable social relationships. (Tr. 342). Neither clinical overview nor MMPI-A Profile suggested significant depression. She had good coping skills to manage discouragement or disappointment.

Claimant maintained intellectual capability in a borderline range, but with relative academic strengths in spelling and arithmetic. She was not obviously depressed or anxious, but did seem to worry significantly about being accepted by others. She maintained some social isolation. However, she maintained confidence in her ability to overcome many difficulties. She demonstrated a capacity to utilize intellectual capability for academic pursuits, which could probably generalize to future work situations.

Dr. Lagarde's impressions were depressive disorder NOS, borderline intellectual functioning, and other psychosocial problems. He noted that claimant appeared to be a good candidate for vocational rehabilitative services. (Tr. 343). She would be able to work independently with some supervision, but might need assistance feeling comfortable with others.

Dr. Lagarde noted that claimant undoubtedly would follow directions from supervisors satisfactorily. He stated that it would be worthwhile to consider fairly brief counseling for claimant so as to help her gain confidence about her capacity for social relationships, and to train her with some social skills as well.

**(5) Report from Dr. G. Gregory Gidman dated April 7, 2005**. Dr. Gidman saw claimant for a vocational rehab orthopedic evaluation for spina bifida. (Tr. 344). She had no lower extremity pain, numbness, or weakness, but did have bowel and bladder incontinence. She had had several operations to her lower extremities and spine.

On examination, claimant was 60 ½ inches tall and weighed 100 pounds. She was wearing a diaper due to her bowel and bladder incontinence.

Claimant's gait was essentially normal. She had deformities of the feet, pes planus deformities, decreased dorsiflexion to neutral of the left ankle, and right heel varus. She could not toe/heel gait.

On forward flexion, claimant was able to touch her toes easily. Lordosis was normal. She had no limitation of lateral bending. She had severe limitation of hyperextension.

Claimant's knee jerks were +3 and symmetrical. Ankle jerks were absent. Motor and sensory examination of the lower extremities was normal. Straight leg

raising was negative.

Claimant had no point tenderness or spasms in the lumbar spine. (Tr. 345). She had atrophy of both legs. Hips had full range of motion.

X-rays showed spina bifida occulta of S1. Claimant had four lumbar vertebra with complete sacralization of L5 to S1.

Dr. Gidman's diagnosis was spina bifida occulta with neurologic involvement of the lower extremities and bowel and bladder involvement. He opined that claimant would be limited in her adult life to light work activities. He stated that she should avoid medium, heavy, and very lifting. He also reported that she would not be able to do any prolonged standing, walking, climbing, or crawling.

Dr. Gidman stated that claimant would be a good candidate for vocational rehab. He said that she needed to be educated and directed into fields where mostly office sedentary/light activities were involved, mostly sitting. She was not in need of any further orthopedic treatment. Her condition was stable.

**(6) Consultative Examination by Dr. Obiefuna Okoye dated August 27, 2005**. Claimant presented with spina bifida. (Tr. 375). She complained of urinary and fecal incontinence. She had no complaints of chest pain or joint pain.

Claimant was able to dress and feed herself. She could stand at one time for 15 to 20 minutes, stand for five hours in an eight-hour period, walk on level ground for about one block, sit for one to two hours, and lift about 10 to 15 pounds. She was not able to drive a car. She could perform household chores, like sweeping, mopping, vacuuming, doing dishes, and shopping. She could climb stairs as well.

Past surgeries included spina bifida surgery and ventricle peritoneal shunt replacement in 1997. She had also had multiple surgeries on both feet. Her medications included Bactrim and Ditropan.

On examination, claimant was 69 inches tall and weighed 92 pounds. Her blood pressure was 73/57. She ambulated without difficulty.

Claimant was able to get on and off the exam table, up and out of the chair, and dress and undress herself without assistance. She could hear conversation at normal voice level. Her speech was 100 percent understandable.

On spine/extremities examination, claimant's pulses were all palpable. (Tr. 377). She had no edema or cyanosis. She had deformed feet and a swaddling gait. Her grip strength was 5/5, and fine and gross manipulative skills were intact.

Claimant could not walk on her heels or toes. She could not squat. She could perform heel to toe. She had no ulcerations or varicosities.

8

Neurologically, claimant was alert and oriented to person, place, time, and situation. Mood and affect were appropriate. She was able to understand and follow simple commands and directions. Motor strength was 5/5.

Sensory, cerebellar, and cranial nerves were intact. Deep tendon reflexes were symmetrical.

Dr. Okoye's impression was spina bifida, status-post multiple surgeries. (Tr. 378). He determined that claimant did not require an assistive device for ambulation.

**(7) Physical Residual Functional Capacity ("RFC") Assessment dated November 1, 2005**. The medical consultant determined that claimant could lift 20 pounds occasionally and 10 pounds frequently. (Tr. 380). She could stand/walk at least two hours in an eight-hour workday. She could sit about six hours in an eight-hour workday. She had unlimited push/pull ability. Her allegations of urinary incontinence were consistent with the objective findings in the medical evidence provided. (Tr. 384).

**(8) Records from Children's Special Health Services dated February 19, 2004 to December 15, 2005**. On February 19, 2004, Dr. Harmon reported that claimant was ambulatory and on intermittent catheterization, Ditropan XL, 10

mgs. once a day and Bactrim suppression at night. (Tr. 393). She had done extremely well. Her urine was completely clear.

On May 19, 2004, Dr. Bennett saw claimant for myelodysplasia and plantigrade feet. (Tr. 392). He noted that she had a thickening at her heel and a little soreness under the second metatarsal of the left foot, suggesting that she was not really paying as close attention to her feet as she needed to. He stated that she was going to have a breakdown somewhere down the line, but that she could try to keep it from happening as often by checking her feet and using the file on her skin, and using an exercise bike instead of walking.

On August 19, 2004, Dr. Harmon noted that claimant did extremely well on clean intermittent catheterization once daily and Bactrim at night. (Tr. 391). She was dry between catheterizations. Her urine was completely clear. Her recent ultrasound showed normal kidneys.

On May 17, 2005, claimant was ambulatory. (Tr. 389). She catheterized four times a day, and was dry in between. Her urine was completely clear.

On September 15, 2005, claimant was doing pretty well, but was sometimes dry and sometimes wet. (Tr. 388). Dr. Harmon increased her Ditropan to 15 mgs.

On December 15, 2005, claimant was doing very well. (Tr. 387). She was dry between catheterizations. Her urine was completely negative.

**(9) Mental RFC dated February 8, 2006**. Judith Parks Levy, Ph.D., found that claimant was moderately limited as to her ability to understand, remember, and carry out detailed instructions. (Tr. 394). Dr. Levy determined that claimant could learn, remember, and perform simple tasks. (Tr. 396). She could also maintain attention and concentration for two-hour blocks of time, maintain appropriate social behavior, and persist over a 40-hour work week. Stress tolerance was adequate for routine work.

**(10) Psychiatric Review Technique (PRT) Form dated February 8, 2006**. Dr. Levy assessed claimant for organic mental disorders. (Tr. 398). She found that claimant had a mild degree of limitation as to restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 408).

**(11) Claimant's Administrative Hearing Testimony**. At the hearing on May 8, 2007, claimant was 19 years old. (Tr. 431). She testified that she was 4 feet 11 inches tall, but was not sure how much she weighed. (Tr. 431-32). She lived with her mother and her 17-year-old sister. (Tr. 432).

Claimant testified that she was working as a cashier at Pizza Hut, and was able to sit down. (Tr. 432-33). She had been working 20 to 24 hours a week for three months. (Tr. 433). She had also worked at Wal-Mart as a cashier.

Claimant stated that she had completed high school and attained a GED certificate of achievement. (Tr. 434). She had worked as a cashier at McDonald's and a waitress at Ryan's. (Tr. 435-36). She testified that she had stopped working because she could not stand on her feet for very long. (Tr. 436).

Regarding complaints, claimant stated that she had to catheterize herself. (Tr. 437). She reported that it worked well around the hours she worked. She stated that she went to the doctor every six months. (Tr. 439). She took Ditropan and Bactrim. (Tr. 440).

As to activities, claimant testified that she helped around the house, did her own laundry, and grocery shopped with her mother. (Tr. 437, 439). She stated that she was learning to drive. (Tr. 438). She also watched television and listened to music. (Tr. 439-40).

Claimant stated that she could climb stairs. (Tr. 440). However, she said that her back would start hurting if she climbed a lot of steps.

**(12) Administrative Hearing Testimony of Claimant's Mother, Debra Gardner**. Ms. Gardner testified that claimant was able to follow instructions. (Tr. 442). She said that claimant's job was "coming along." She reported that she did not think that claimant could handle full-time work because claimant became tired after working a certain amount. (Tr. 443).

**(13) Administrative Hearing Testimony of Lionel J. Bordelon, Vocational Expert ("VE")**. Mr. Bordelon testified that claimant's work as a cashier was light with an SVP of 3, and a waitress was light with an SVP of 2. (Tr. 445). The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience; who could lift and carry about 20 pounds occasionally and 10 pounds frequently; could stand and walk for about four hours in a day; could sit about six hours in a day, and could not do complex work, but could do one, two and three-step jobs. In response, Mr. Bordelon testified that claimant could do her current job, which was in an accommodated capacity.

Additionally, Mr. Bordelon stated that claimant could work in sales support types of occupations, of which there were 80,198 jobs nationally and 1,450 statewide; dispatcher positions, of which there were approximately 112,099 jobs nationally and 2,262, reduced by 25 percent, and file clerks, of which there were 298,526 positions nationally and 3,539 statewide, reduced by 25 percent. (Tr. 445-46). When ALJ modified the hypothetical to assume that claimant could not complete a 40-hour week because of fatigue, pain, or discomfort, the VE testified that she could not do these jobs or any other jobs on a sustained basis. (Tr. 446-47).

**(14) The ALJ's Findings are Entitled to Deference**. Claimant argues that the Commissioner erred: (1) in failing to consider the effect of her feet problems and

bowel and bladder incontinence on her ability to maintain employment, (2) in failing to include these limitations in the hypotheticals to the vocational expert.

First, claimant asserts that the ALJ failed to properly consider the limitations from her bowel and bladder incontinence. [rec. doc. 6, p. 4]. However, the record reflects that the ALJ did consider this impairment in his opinion.

At the hearing, claimant testified that she had to catheterize herself. (Tr. 437). She further reported that it worked well around the hours she worked.

Additionally, the reports from claimant's treating physician support the fact that claimant's incontinence did not prevent her from working. Dr. Harmon reported that claimant had done "extremely well" with catheterizations and medication. (Tr. 391, 393). He also noted that she was dry between catheterizations. (Tr. 389, 391). On one occasion when claimant reported that she was sometimes dry and sometimes wet, Dr. Harmon increased her medications. (Tr. 388). After increasing her dosage, she did "very well," and was dry between catheterizations. (Tr. 387). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). Thus, this argument lacks merit.

Next, claimant asserts that the ALJ erred in failing to include her limitations of bowel and bladder incontinence in the hypotheticals to the vocational expert. [rec. doc. 6, p. 7]. However, the ALJ did not consider claimant's incontinence to be as limiting as she had alleged. (Tr. 32). Instead, he adopted the limitations found by the state agency physician and Dr. Gidman. (Tr. 445-47). These restrictions are supported by the reports. (Tr. 344-45; 380-84). As the ALJ's hypotheticals to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed December 3, 2008, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE